**CASE BEING CONSIDERED FOR TREATMENT PURSUANT TO RULE 34(j) OF THE COURT'S RULES**

No. 25-7114

In the

# United States Court of Appeals
### for the District of Columbia Circuit

DOE CORPORATION 1,

DOE CORPORATION 2,

DOE CORPORATION 3,

DOE CORPORATION 4,

*Plaintiffs-Appellants,*

v.

INTER-AMERICAN DEVELOPMENT BANK,

*Defendant-Appellee.*

On Appeal from the United States District Court for the
District of Columbia, Case No. 1:25-cv-01404-UNA

**APPELLANTS' APPENDIX (VOLUME I)
PUBLIC APPENDIX –
SEALED MATERIAL IN SEPARATE SUPPLEMENT**

Margaret E. Krawiec
Michael A. McIntosh
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
margaret.krawiec@skadden.com

*Counsel for Plaintiffs-Appellants Doe
Corporation 1, Doe Corporation 2,
Doe Corporation 3, and Doe
Corporation 4*

# APPENDIX
## TABLE OF CONTENTS

**VOLUME ONE**
**Documents (Dkt. No.)**

District Court Docket Report ......................................................................................App. 1

Complaint (Dkt. No. 1) ...............................................................................................App. 4

May 14, 2025 Order Denying Motion to Proceed Under Pseudonym (as revised May 15,

2025) (Dkt. No. 6) .......................................................................................................App. 32

June 30, 2025 Order Denying Motion to Reconsider (Dkt. No. 12) ...........................App. 38


**VOLUME TWO (UNDER SEAL)**
**Documents (Dkt. No.)**

Declaration in Support of Motion to Proceed Under Pseudonym and for Preliminary

Injunction (Dkt. No. 2-2) .............................................................................................App. 47

Corporate Disclosure Statements ...............................................................................App. 54

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25- cv- 01404- UNA

DOE CORPORATION 1 et al v. INTER- AMERICAN
DEVELOPMENT BANK
Assigned to: Unassigned
Case in other court: USCA, 25- 07114
Cause: 28:1331 Fed. Question

Date Filed: 05/08/2025
Jury Demand: None
Nature of Suit: 190 Contract: Other
Jurisdiction: Federal Question

**Plaintiff**

**DOE CORPORATION 1**                 represented by **Michael Allen McIntosh**
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371- 7201
Fax: (202) 661- 8201
Email: michael.mcintosh@skadden.com
*ATTORNEY TO BE NOTICED*

**Margaret Elizabeth Krawiec**
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371- 7303
Fax: (202) 661- 9123
Email: margaret.krawiec@skadden.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DOE CORPORATION 2**                 represented by **Michael Allen McIntosh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Margaret Elizabeth Krawiec**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DOE CORPORATION 3**                 represented by **Michael Allen McIntosh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Margaret Elizabeth Krawiec**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DOE CORPORATION 4**                 represented by **Michael Allen McIntosh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Margaret Elizabeth Krawiec**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**INTER- AMERICAN
DEVELOPMENT BANK**

**Movant**

**EUGENE VOLOKH**                                represented by **EUGENE VOLOKH**
*Thomas M. Siebel Senior Fellow Hoover*                    434 Galvez Mall
*Institution, Stanford University*                         Stanford, CA 94305
                                                          650- 721- 5092
                                                          PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 05/08/2025 | 1 | COMPLAINT against INTER- AMERICAN DEVELOPMENT BANK *(Filing fee $ 405 receipt number ADCDC- 11677230)* (Fee Status:Filing Fee Waived) filed by DOE CORPORATION 4, DOE CORPORATION 1, DOE CORPORATION 3, DOE CORPORATION 2. (Attachments: # 1 Exhibit A - Filed Under Seal, # 2 Exhibit B - Filed Under Seal, # 3 Exhibit C - Filed Under Seal, # 4 Exhibit D - Filed Under Seal, # 5 Exhibit E - Filed Under Seal, # 6 Exhibit F - Filed Under Seal, # 7 Exhibit G - Filed Under Seal, # 8 Exhibit H - Filed Under Seal, # 9 Exhibit I - IDB Charter, # 10 Exhibit J - 2015 IDB Sanctions Procedures, # 11 Civil Cover Sheet, # 12 Summons to Inter- American Development Bank, # 13 L.R. 26.1 Disclosure Statement Filed Under Seal)(Krawiec, Margaret) (Entered: 05/08/2025) |
| 05/08/2025 | 2 | SEALED MOTION to Proceed Under Pseudonym filed by DOE CORPORATION 1, DOE CORPORATION 2, DOE CORPORATION 3, DOE CORPORATION 4 (Attachments: # 1 Memorandum in Support, # 2 Declaration in Support, # 3 Disclosure Statements, # 4 Exhibit A - Under Seal Exhibit to Complaint, # 5 Exhibit B - Under Seal Exhibit to Complaint, # 6 Exhibit C - Under Seal Exhibit to Complaint, # 7 Exhibit D - Under Seal Exhibit to Complaint, # 8 Exhibit E - Under Seal Exhibit to Complaint, # 9 Exhibit F - Under Seal Exhibit to Complaint, # 10 Exhibit G - Under Seal Exhibit to Complaint, # 11 Exhibit H - Under Seal Exhibit to Complaint, # 12 Declaration of Identity, # 13 Text of Proposed Order)(Krawiec, Margaret) (Entered: 05/08/2025) |
| 05/08/2025 | 3 | MOTION for Preliminary Injunction by DOE CORPORATION 1, DOE CORPORATION 2, DOE CORPORATION 3, DOE CORPORATION 4. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Krawiec, Margaret) (Entered: 05/08/2025) |
| 05/08/2025 | 4 | NOTICE of Appearance by Michael Allen McIntosh on behalf of DOE CORPORATION 1, DOE CORPORATION 2, DOE CORPORATION 3, DOE CORPORATION 4 (McIntosh, Michael) (Entered: 05/08/2025) |
| 05/08/2025 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Ryan D. Junck, Filing fee $ 100, receipt number ADCDC- 11678012. Fee Status: Fee Paid. by DOE CORPORATION 1, DOE CORPORATION 2, DOE CORPORATION 3, DOE CORPORATION 4. (Attachments: # 1 Declaration of Ryan D. Junck, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Krawiec, Margaret) (Entered: 05/08/2025) |
| 05/14/2025 | 6 | ORDER: The Court ORDERS that: 1) Plaintiffs' 2 Motion for Leave to File Under Pseudonym is DENIED; 2) Within fourteen days of the Court's Order, Plaintiffs shall file a Notice advising the Clerk of the Court whether they wish to proceed with filing the Complaint on the public docket using their real names, and, if so, shall also file their 2 Motion on the public docket as an appendix to the Notice; and 3) If Plaintiffs do not file such Notice within fourteen days, the Clerk is directed to terminate the case. Signed by Chief Judge James E. Boasberg on May 14, 2025. (lcjeb3) (Main Document 6 replaced on 5/15/2025) (znbn). (Entered: 05/14/2025) |
| 05/14/2025 | 7 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by DOE CORPORATION 1, DOE CORPORATION 2, DOE CORPORATION 3, DOE CORPORATION 4 (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order to File Under Seal, # 2 Emergency |

| | | |
|---|---|---|
| | | Motion to Redact, # <u>3</u> Exhibit A, # <u>4</u> Text of Proposed Order Motion to Redact)(Krawiec, Margaret) (Entered: 05/14/2025) |
| 05/19/2025 | <u>8</u> | MOTION for Reconsideration re <u>6</u> Memorandum & Opinion,,, Order,, by DOE CORPORATION 1, DOE CORPORATION 2, DOE CORPORATION 3, DOE CORPORATION 4. (Attachments: # <u>1</u> Memorandum in Support of Plaintiffs' Motion to Reconsider, # <u>2</u> Text of Proposed Order)(Krawiec, Margaret) (Entered: 05/19/2025) |
| 05/21/2025 | <u>10</u> | MOTION to Intervene and MOTION to Unseal Document by EUGENE VOLOKH. (Attachments: # <u>1</u> Text of Proposed Order)(zmtm) (Entered: 05/28/2025) |
| 05/27/2025 | <u>9</u> | MOTION for Extension of Time to *Extend Plaintiffs' Deadline to Comply with the Court's May 14, 2025 Order Pending Resolution of Plaintiffs' Motion to Reconsider* by DOE CORPORATION 1, DOE CORPORATION 2, DOE CORPORATION 3, DOE CORPORATION 4. (Attachments: # <u>1</u> Text of Proposed Order)(Krawiec, Margaret) (Entered: 05/27/2025) |
| 06/23/2025 | <u>11</u> | NOTICE *Regarding Pending Motion to Reconsider* by DOE CORPORATION 1, DOE CORPORATION 2, DOE CORPORATION 3, DOE CORPORATION 4 (Krawiec, Margaret) (Entered: 06/23/2025) |
| 07/30/2025 | <u>12</u> | ORDER: The Court ORDERS that: 1) Plaintiffs' <u>8</u> Motion for Reconsideration is DENIED; 2) Within fourteen days of the Court's Order, Plaintiffs shall file a Notice advising the Clerk of the Court whether they wish to proceed with filing the Complaint on the public docket using their real names, and, if so, shall also file their <u>2</u> Motion for Leave to File under Pseudonym and <u>8</u> Motion for Reconsideration on the public docket as an appendix to the Notice; and 3) If Plaintiffs do not file such Notice within fourteen days, the Clerk is directed to terminate the case. SIGNED by Chief Judge James E. Boasberg on July 30, 2025. (lcjeb3) (Entered: 07/30/2025) |
| 07/30/2025 | <u>13</u> | NOTICE of Supplemental Authority by EUGENE VOLOKH re <u>10</u> Motion to Intervene, Motion to Unseal Document (zmtm) (Entered: 08/04/2025) |
| 08/04/2025 | <u>14</u> | MOTION to Stay *the Court's July 30, 2025 Order and the Deadline to Effect Service of Process on Defendant* by DOE CORPORATION 1, DOE CORPORATION 2, DOE CORPORATION 3, DOE CORPORATION 4. (Attachments: # <u>1</u> Text of Proposed Order)(McIntosh, Michael) (Entered: 08/04/2025) |
| 08/04/2025 | <u>15</u> | NOTICE OF INTERLOCUTORY APPEAL as to <u>12</u> Order on Motion for Reconsideration,,, Set/Reset Deadlines,, <u>6</u> Memorandum & Opinion,,, Order,, by DOE CORPORATION 1, DOE CORPORATION 2, DOE CORPORATION 3, DOE CORPORATION 4. Filing fee $ 605, receipt number ADCDC- 11864601. Fee Status: Fee Paid. Parties have been notified. (McIntosh, Michael) (Entered: 08/04/2025) |
| 08/13/2025 | <u>16</u> | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re <u>15</u> Notice of Interlocutory Appeal,. (zdp) (Entered: 08/13/2025) |
| 08/15/2025 | <u>17</u> | Supplemental Record on Appeal transmitted to US Court of Appeals re, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re <u>15</u> Notice of Interlocutory Appeal,. (zmtm) Modified on 8/15/2025 (zmtm). (Entered: 08/15/2025) |
| 08/15/2025 | | USCA Case Number 25- 7114 for <u>15</u> Notice of Interlocutory Appeal, filed by DOE CORPORATION 2, DOE CORPORATION 1, DOE CORPORATION 4, DOE CORPORATION 3. (znmw) (Entered: 08/15/2025) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DOE CORPORATION 1** | |
| **DOE CORPORATION 2** | Civil Action No. _____ |
| **DOE CORPORATION 3** | |
| **DOE CORPORATION 4** c/o Skadden, Arps, Slate, Meagher & Flom LLP 1440 New York Ave. NW Washington, DC 20005 | |
| *Plaintiffs*, | |
| v. | |
| **INTER-AMERICAN DEVELOPMENT BANK** 1300 New York Ave. NW Washington, DC 20577 | |
| *Defendant*. | |

**COMPLAINT**

1.      This is an action arising under the federal statute governing suits against the Inter-American Development Bank (the "IDB"), 22 U.S.C. § 283f.  Plaintiffs Doe Corporation 1, Doe Corporation 2, Doe Corporation 3, and Doe Corporation 4 (collectively, "Doe Corporations") seek relief against the IDB as a result of the IDB's unlawful and illegitimate exercise of enforcement authority against Doe Corporations.

**INTRODUCTION**

2.      This action challenges the IDB's assumption of police power untethered to any source of authority.  In violation of both its governing charter and its contracts with Doe Corporations, the IDB has initiated formal internal enforcement proceedings (referred to as

App. 4

"sanctions proceedings") against Doe Corporations based on alleged conduct that occurred more than a year before the parties executed a single agreement or the IDB disbursed a single dollar to Doe Corporations. The IDB's power grab immediately subjects Doe Corporations to unauthorized sanctions proceedings without any opportunity for external review. And, given that the enforcement process is heavily biased toward the IDB, the pending proceedings likely will culminate in the imposition of a range of highly punitive sanctions against Doe Corporations that will hamstring their ability to undertake development projects throughout the world, imperil their significant investment in the underlying commercial project, and cause indelible reputational harm, among other far-reaching consequences.

3.     Doe Corporation 1, Doe Corporation 2, and Doe Corporation 3 entered into a series of financing agreements with the IDB in 2018 to facilitate a commercial project (the "Commercial Project") with which the IDB was not otherwise involved. Those agreements, in tandem with the IDB's charter, clearly demarcate the IDB's authority over Doe Corporations. The IDB may initiate sanctions proceedings against Doe Corporations based only on specific, enumerated categories of conduct—and only if that conduct post-dates the parties' execution of the financing agreements that form the basis of the parties' relationship.

4.     Despite these clear limitations on its authority, the IDB has initiated sanctions proceedings against Doe Corporations based exclusively on alleged activities that occurred over a year before the commencement of any contractual relationship between Doe Corporations and the IDB. The IDB's commencement of sanctions proceedings in these circumstances is not rooted in any source of authority. It also violates the terms of the contractual agreements between the IDB and Doe Corporations, none of which purports to confer such all-encompassing power on the IDB.

5.      If allowed to continue, the sanctions proceedings against Doe Corporations will cause irreparable harm.  Doe Corporations are now on the clock, forced to defend themselves in unauthorized, one-sided proceedings almost certain to result in the imposition of draconian sanctions, with no possibility of outside review.  Doe Corporations have been and will continue to be subject to severe and irreversible reputational harm through the imminent disclosure of the IDB's investigation, unsubstantiated allegations, and findings, even though the proceedings have been illegitimate from the start.  Such disclosures also will jeopardize Doe Corporations' long-term investment in the Commercial Project.

6.      The IDB's initiation of sanctions proceedings against Doe Corporations reflects a particularly egregious about-face.  Doe Corporations proactively raised the spurious allegations of misconduct that had surfaced and now form the predicate for the IDB's enforcement activity.  Doe Corporations then cooperated with an IDB affiliate's ensuing investigation of the allegations, voluntarily providing detailed information.  The IDB and other lenders continued to provide the agreed-on loan disbursements to Doe Corporations uninterrupted, even after the allegations surfaced.  Those disbursements continued following the completion of the inquiry, until the IDB abruptly reversed course and manufactured a case fit for sanctions.

7.      Doe Corporations bring this action to vindicate the terms of their contractual relationship with the IDB, confirm fundamental limitations on the IDB's power, and enjoin the IDB from unlawfully continuing sanctions proceedings and imposing onerous penalties.

**PARTIES**

8.      Plaintiff Doe Corporation 1 is a corporation that is incorporated and has its principal place of business outside of the United States.

9.      Plaintiff Doe Corporation 2 is a subsidiary of Doe Corporation 1 that is incorporated and has its principal place of business outside of the United States.

10.     Plaintiff Doe Corporation 3 is a subsidiary of Doe Corporation 1 that is incorporated and has its principal place of business outside of the United States.

11.     Plaintiff Doe Corporation 4 is a subsidiary of Doe Corporation 1 that is incorporated and has its principal place of business in the United States.

12.     Defendant Inter-American Development Bank is an international financial institution established pursuant to the Agreement Establishing the Inter-American Development Bank, *opened for signature* Apr. 8, 1959, 10 U.S.T. 3068 (the "Charter").  The IDB is domiciled in the District of Columbia.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this action pursuant to 22 U.S.C. § 283f and 28 U.S.C. §§ 1331 and 1332.

14.     Pursuant to 22 U.S.C. § 288a(b) and 28 U.S.C. § 1605(a)(1), the IDB has waived any immunity under the International Organizations Immunities Act (the "IOIA"), 22 U.S.C. §§ 288-288f, that it otherwise might have claimed as a defense to the claims asserted in this Complaint.

15.     This Court has personal jurisdiction over the IDB under 22 U.S.C. § 283f.

16.     Venue properly lies in this Court under 22 U.S.C. § 283f.

## FACTS

### I.    The Commercial Project and the Financing Agreements

17.    Doe Corporation 3, a subsidiary of Doe Corporation 1, executed an agreement to complete the Commercial Project (the "Commercial Project Agreement").  The IDB was not involved with the Commercial Project at this point.

18.    In 2018—more than a year after the Commercial Project Agreement was executed—Doe Corporation 1, Doe Corporation 2, and Doe Corporation 3 entered into agreements to obtain financing from the IDB and other parties to fund the Commercial Project.

19.    First, Doe Corporation 3 entered into the Common Terms Agreement with the IDB (expressly through its agent, the Inter-American Investment Corporation ("IDB Invest")), IDB Invest (in its own and other capacities), and other lenders (collectively, the "Senior Lenders"). Ex. A to Compl. and Mot. to Proceed Under Pseudonym ("Combined Ex. A"), Common Terms Agreement ("CTA").[1]

20.    Second, Doe Corporation 3 entered into the IDB Group Senior Loan Agreement (the "Senior Loan Agreement") with the IDB (again expressly through its agent, IDB Invest) and IDB Invest.  Combined Ex. B, Senior Loan Agreement.

---

[1]    Combined Exhibit A consists of the main Common Terms Agreement and Annex 1 thereto.

Consistent with Doe Corporations' request for relief in their contemporaneously filed Motion to Proceed Under Pseudonym, Doe Corporations have filed Exhibits A through H to this Complaint as slipsheets.  Doe Corporations are filing full and unredacted versions of those Exhibits under seal as attachments to their Motion to Proceed Under Pseudonym. Consequently, this Complaint (and other contemporaneously filed documents) refers to these documents as "Combined Exhibits" to both the Complaint and Motion to Proceed Under Pseudonym.  Exhibits I and J to this Complaint are not being filed under seal, and are thus referred to as "Exhibits."

21.     The Common Terms Agreement and the Senior Loan Agreement (collectively, the "Loan Agreements") reflect the agreement between the Senior Lenders (including the IDB) to lend, and Doe Corporation 3 to borrow, "subject to the terms and conditions set forth" within those documents.  Combined Ex. A, CTA, at 2; Combined Ex. B, Senior Loan Agreement, at 1.  Neither the IDB nor IDB Invest had any prior involvement with any aspect of the Commercial Project.

22.     Doe Corporation 1, Doe Corporation 2, and Doe Corporation 3 entered into several additional agreements with the IDB and other entities relevant to this transaction.  Relevant here, all entered into an Equity Contribution and Subordination Agreement with the Senior Lenders and other entities.  *See* Combined Ex. C, Equity Contribution and Subordination Agreement ("ECSA"). The parties' entry into the Equity Contribution and Subordination Agreement was a condition precedent to the first disbursement of each senior loan to Doe Corporation 3.  *See id.*, at 3 (stating also that Doe Corporation 1, Doe Corporation 2, and Doe Corporation 3 entered into the agreement "[i]n consideration of each Senior Lender entering into the Common Terms Agreement and each Senior Loan Agreement").[2]

---

[2]  Combined Exhibit C consists of the main Equity and Subordination Agreement, but omits appendices.

None of these other agreements conflicts with or differs in material respects from the Common Terms Agreement or the Senior Loan Agreement.  Indeed, the entire corpus of agreements between Doe Corporations and the IDB are to be treated as a unified whole.  *See, e.g.*, Combined Ex. A, CTA § 7.12 (incorporating other agreements into an integration clause); Combined Ex. C, ECSA § 1.1–1.2 (incorporating definitions and interpretation principles from CTA); 6 (including Doe Corporations 1, 2, and 3 within the definition of "Loan Party"). Accordingly, although Doe Corporation 1 and Doe Corporation 2 did not separately execute the Common Terms Agreement or the Senior Loan Agreement, both Agreements effectively have been incorporated into the other agreements to which Doe Corporation 1 and Doe Corporation 2 are parties for all purposes relevant to this action.  *See generally* Combined Ex. A, CTA § 6.1 (articulating various events of default based on conduct by "Loan Parties," including Doe Corporation 1 and Doe Corporation 2).

App. 9

23.     Doe Corporation 3 received installments of the IDB loan in 2019 and 2020.  Doe Corporation 3 has timely made all payments on the loan to date, and Doe Corporations have otherwise adequately performed all of the contractual obligations owed to the IDB and the other counterparties.

## II.     The IDB's Investigation and Commencement of Sanctions Proceedings

24.     In 2020, the Office of Institutional Integrity (the "OII"), a division of the IDB, began to investigate events concerning the execution of the Commercial Project Agreement.  The OII's investigation centered exclusively on conduct that pre-dates, by more than a year, the beginning of the contractual relationship between Doe Corporations and the IDB and the disbursement of any funds.

25.     Prior to the OII's commencement of the investigation—and before receiving the first loan disbursement—Doe Corporations proactively informed IDB Invest of allegations that had surfaced regarding the award of the Commercial Project Agreement.  Doe Corporations steadfastly denied the allegations and provided information to demonstrate that the allegations were unfounded.

26.     IDB Invest, which had already conducted extensive due diligence related to the Commercial Project, inquired further about the allegations.  Doe Corporations cooperated with these due diligence efforts by, among other things, providing detailed information and documentation to refute the allegations.  Doe Corporations also provided information in response to questions from senior IDB Invest personnel and requests from the Senior Lenders' outside legal counsel.  IDB Group[3] policy permitted IDB Invest to disclose the information provided by Doe

---

3     The IDB Group is comprised of IDB, IDB Invest, and the Multilateral Investment Fund, also known as "IDB Lab").

Corporations to the OII.  IDB Invest ultimately ceased its inquiries regarding the allegations and continued its support of the Commercial Project.

27.    Doe Corporation 3 received the first disbursement of loan funds from the IDB (and IDB Invest) shortly after disclosing the allegations.  Doe Corporation 3 continued to receive additional loan disbursements both during and after the subsequent diligence process, consistent with the parties' agreements.

28.    Nevertheless, in early 2020—well after Doe Corporations' disclosure of the allegations and accompanying provision of information in response to IDB Invest's inquiries—the OII notified Doe Corporations that it was initiating an investigation into the award of the Commercial Project Agreement.  OII issued a series of requests for documents and information.  Once again, Doe Corporations fully cooperated with that investigation to try to resolve the matter without the need to resort to adversarial proceedings within the IDB or in a U.S. court.  At the same time, Doe Corporations made clear both that the allegations are without merit and that the IDB lacks the authority to initiate sanctions proceedings against Doe Corporations for alleged conduct that pre-dates the parties' contractual relationship and does not relate to any funds that the IDB disbursed under the Loan Agreements.  Doe Corporations provided the OII with a voluminous record in support of this contention, including a report in which government auditors concluded, following an extensive audit, that the Commercial Project Agreement had been properly awarded.

29.    Unfortunately, the parties' negotiations to resolve the matter were unsuccessful, and, on September 24, 2024, the OII issued written notice that it was terminating the negotiated resolution process.

30.    On April 28, 2025, the IDB's Office of the Sanctions Officer issued a separate Notice of Administrative Action to each of Doe Corporation 1, Doe Corporation 2, Doe

Corporation 3, and Doe Corporation 4 (the "Notices"), pursuant to the IDB's Sanctions Procedures. Combined Exs. D–G, Notices. The Notices clarify that the charges, and the IDB's sanctions proceedings, are "linked" to the Common Terms Agreement, the Senior Loan Agreement, and the Equity Contribution and Subordination Agreement. *See,* Combined Ex. D, Notice to Doe Corporation 1, at 1. Alongside the Notices, the IDB provided Doe Corporations with the OII's Statement of Charges and Evidence (the "Statement of Charges"), which the OII had presented to the Sanctions Officer. Combined Ex. H, Statement of Charges.

31.    The Statement of Charges asserts that a "preponderance of the evidence" shows that Doe Corporation 1 and Doe Corporation 2 engaged in so-called "Prohibited Practices," a category of conduct defined in the Sanctions Procedures. *See* ¶¶ 40–41 *infra*. The Statement of Charges further claims that Doe Corporation 3 and Doe Corporation 4 may be sanctioned to the same extent as Doe Corporation 1 and Doe Corporation 2 as a result of the supposed commission of those Prohibited Practices.

32.    All of the conduct that forms the basis of the charges against Doe Corporations pre-dates the execution of the Loan Agreements and the Equity Contribution and Subordination Agreement by a year or more. None of the alleged misconduct relates to the use of any funds that the IDB provided to Doe Corporations.

33.    Service of the Notices triggered the IDB's formal sanctions proceedings against Doe Corporations. The Notices request Doe Corporations' response to the Sanctions Officer's assertions by June 27, 2025. The Notices make clear that Doe Corporations' failure to respond to the allegations will be considered an admission of the allegations and a waiver of any future right to appeal the Sanctions Officer's final determination to the IDB's Sanctions Committee. *See, e.g.*, Combined Ex. D, Notice to Doe Corporation 1, at 1, 5.

App. 12

34.    Doe Corporations have incurred, and will continue to incur, expenses, including, but not limited to, attorneys' fees, in responding to the Notices and otherwise participating in the sanctions proceedings pending resolution of this action and Doe Corporations' request for preliminary injunctive relief.  Those expenses exceed $75,000.

### III.    Scope of the IDB's Enforcement Authority

35.    The IDB is an international organization that was created by a multinational agreement (the Charter).  *See* Ex. I, Charter.  The IDB derives its authority from the Charter.

### A.    The Charter

36.    The Charter identifies the IDB's "purpose" as "contribut[ing] to the acceleration of the process of economic and social development of the regional development member countries, individually and collectively."  Ex. I, Charter, Art. I, § 1.  The Charter grants specific "functions" to the IDB "[t]o implement its purpose."  *Id.*, Art. I, § 2(a).  As is relevant here, the Charter states that the IDB "shall" "promote the investment of public and private capital for development purposes," "utilize its own capital . . . for financing the development of the member countries," and "encourage private investment in projects, enterprises, and activities contributing to economic development and . . . supplement private investment when private capital is not available on reasonable terms and conditions."  *Id.*, Art. I, §§ 2(a)(i)–(iii).

37.    The Charter grants the IDB carefully circumscribed enforcement authority.  It provides that the IDB "shall take the necessary measures to ensure that the proceeds of any loan made, guaranteed, or participated in by the Bank are used only for the purposes for which the loan was granted, with due attention to considerations of economy and efficiency."  *Id.*, Art. III, § 9(b).

38.    The IDB's enforcement authority thus is limited to events following the execution of financing agreements with a loan recipient and the disbursement of funds.  After all, the IDB

must enter an agreement with the recipient outlining the "purposes for which the loan was granted" before it can invoke its power to ensure that the loaned funds are used in a manner consistent with those purposes. *Id.* And the IDB must actually transfer funds to a recipient before it can exercise its authority to trace the "proceeds" of the "loan." *Id.*

    **B.**    **Sanctions Procedures**

    39.    To implement the enforcement authority granted by the Charter, the IDB, along with the other members of the IDB Group, has adopted Sanctions Procedures. The Sanctions Procedures apply to the IDB Group's contractual counterparties. They "are to be followed in connection with allegations of fraud and corruption in Projects of the [IDB and IDB Invest]." Ex. J, 2015 Sanctions Procedures § 1.1.[4]

    40.    "Parties subject to [the Sanctions] Procedures are prohibited from engaging in [Prohibited Practices]." *Id.* § 2.2. The Sanctions Procedures define five categories of Prohibited Practices. *Id.* § 2.2(a) ("A '*Corrupt Practice*' is the offering, giving, receiving, or soliciting, directly or indirectly, anything of value to influence improperly the actions of another party."); *id.* § 2.2(b) ("A '*Fraudulent Practice*' is any act or omission, including a misrepresentation, that knowingly or recklessly misleads, or attempts to mislead, a party to obtain a financial or other benefit or to avoid an obligation."); *id.* § 2.2(c) ("A '*Coercive Practice*' is impairing or harming, or threatening to impair or harm, directly or indirectly, any party or the property of the party to influence improperly the actions of a party."); *id.* § 2.2(d) ("A '*Collusive Practice*' is an arrangement between two or more parties designed to achieve an improper purpose, including

---

[4]    The Complaint refers to the 2015 Sanctions Procedures, which were in place at the time that the parties executed the Loan Agreements and, accordingly, control here. In any event, the relevant provisions of the current Sanctions Procedures are virtually identical in all respects material to this action.

influencing improperly the actions of another party."); *id.* § 2.2(e) ("An '*Obstructive Practice*' is (a) deliberately destroying, falsifying, altering or concealing evidence material to the investigation or making false statements to investigators in order to materially impede a Bank Group investigation into allegations of a corrupt, fraudulent, coercive or collusive practice; and/or threatening, harassing or intimidating any party to prevent it from disclosing its knowledge of matters relevant to the investigation or from pursuing the investigation; or (b) acts intended to materially impede the exercise of the Bank Group's inspection and audit rights.").

41.     The Sanctions Procedures permit the IDB to initiate sanctions proceedings only after the OII concludes "that a preponderance of the evidence supports a finding of a Prohibited Practice." *Id.* § 3.3.  Likewise, the IDB may ultimately impose sanctions only "[u]pon a finding that the Respondent engaged in a Prohibited Practice." *Id.* § 8.1.

42.     Three aspects of the Sanctions Procedures confirm that the IDB's authority to initiate sanctions proceedings and impose sanctions must be based on conduct following the execution of the relevant financing agreements.  First, the Sanctions Procedures come into force only after the relevant loan agreement is executed.  *See id.* § 1.2.  Second, the Sanctions Procedures themselves operate only prospectively.  They permit the initiation of sanctions proceedings and the imposition of sanctions only on persons "*engaging* in [Prohibited Practices]."  *Id.* § 2.2 (emphasis added).  Third, the Sanctions Procedures define the relevant Prohibited Practices in a forward-looking manner, using the present tense.  *Id.*

C.     **Financing Agreements**

43.     The financing agreements executed by Doe Corporations do not augment the enforcement authority that the Charter and Sanctions Procedures grant the IDB.  Nothing in the Loan Agreements, or in the Equity Contribution and Subordination Agreement, authorizes the IDB

to initiate sanctions proceedings against Doe Corporations based on conduct pre-dating the execution of the agreements. To the contrary, these agreements reinforce that the IDB's authority to initiate sanctions proceedings is prospective only.

44. The Common Terms Agreement enumerates fifteen "Events of Default" for which the IDB may seek redress. Combined Ex. A, CTA § 6.1. It separately defines "Policy Events of Default." *Id.* Annex 1-28. These categories encompass "events of default" based on the conduct of other Loan Parties as defined by the relevant contractual agreements (including, for example, the parties to the Equity Contribution and Subordination Agreement). None of those Events of Default or Policy Events of Default involves the commission of Prohibited Practices—or, indeed, any conduct—before the execution of the Common Terms Agreement.

45. Similarly, the Senior Loan Agreement states that Doe Corporation 3 "shall not engage in (or authorize or permit any Affiliate or any other Person acting on its behalf to engage in) any Prohibited Practice with respect to the Project." Combined Ex. B, Senior Loan Agreement § 3.3.3. This language is solely prospective, barring Doe Corporations from committing Prohibited Practices *after* the execution of the Senior Loan Agreement. *Id.* The same language is present as applied to Doe Corporation 1 and Doe Corporation 2 in the Equity Contribution and Subordination Agreement. Combined Ex. C, ECSA § 4.1. As with the Sanctions Procedures, both agreements define Prohibited Practices in an exclusively forward-looking manner. *See* Combined Ex. B, Senior Loan Agreement, Annex 1; Combined Ex. C, ECSA, at 8 (incorporating definition from Senior Loan Agreement).

46. The Common Terms Agreement enumerates five remedies for Events of Default and Policy Events of Default. *Id.* § 6.2.3. The Agreement does not expressly mention sanctions proceedings or any other type of administrative enforcement action. At most, the Agreement refers

to the Sanctions Procedures only indirectly, in the catch-all remedies clause, which permits the IDB to "exercise any other remedies that may be available to it under any Financing Document or *Applicable Law*." *Id.* §§ 6.2.3(a)(v), 6.2.3(b)(iii) (emphasis added). To the extent that the Sanctions Procedures are incorporated into the Agreement, then, they are incorporated without modification through the term "Applicable Law." Thus, the Common Terms Agreement reinforces that sanctions proceedings may be initiated against Doe Corporations based solely on Prohibited Practices committed after the execution of the Agreement, consistent with the plain text of the Sanctions Procedures.

47.    Likewise, the Senior Loan Agreement provides that "it shall be a Policy Event of Default if any Loan Party . . . engages in a Prohibited Practice in connection with the Project." *Id.* § 3.4.1(b). It also "incorporate[s]" the remedies provisions from the Common Terms Agreement. *Id.* § 3.4.1(a). Like the Common Terms Agreement, then, the Senior Loan Agreement limits the IDB's authority to impose sanctions to Doe Corporations' commission of Prohibited Practices following the execution of the Agreement.

## IV.    The IDB's Breach of the Loan Agreements

48.    By initiating sanctions proceedings against Doe Corporations based exclusively on conduct pre-dating the execution of the Loan Agreements, the IDB has breached the Loan Agreements in at least two fundamental ways.

49.    First, the IDB has breached the provisions in the Loan Agreements that enumerate the Events of Default and Policy Events of Default for which the IDB may seek relief. The Common Terms Agreement includes a comprehensive list of fifteen Events of Default and exhaustively describes Policy Events of Default. Combined Ex. A, CTA § 6.1, Annex 1-28. The Senior Loan Agreement incorporates those lists (adding a single event that relates solely to the

App. 17

prospective commission of Prohibited Practices).  Combined Ex. B, Senior Loan Agreement § 3.4.1; *see also* ¶ 47, *supra*.  These provisions of the Loan Agreements identify the entire universe of acts by Doe Corporations for which the IDB may seek relief.  The commission of Prohibited Practices before execution of the Loan Agreements is not within that universe.  Accordingly, the IDB's commencement of the present sanctions proceeding against Doe Corporations, which is exclusively based on alleged Prohibited Practices pre-dating entry into the Loan Agreements, breached the Loan Agreements.

50.    Second, the IDB has breached the provisions in the Loan Agreements that enumerate the remedies available to the IDB based on an Event of Default or Policy Event of Default.  The Loan Agreements include an exhaustive list of five potential remedies in such circumstances.  Combined Ex. A, CTA § 6.2.3; *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a) (incorporating CTA § 6.2.3).  They do not explicitly authorize the commencement of sanctions proceedings in response to the alleged commission of an Event of Default or Policy Event of Default.  At most, the Loan Agreements incorporate the Sanctions Procedures, if at all, only insofar as they permit the IDB to "exercise any other remedies that may be available to it under . . . Applicable Law."  Combined Ex. A, CTA § 6.2.3; *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a) (incorporating CTA § 6.2.3).  But the Sanctions Procedures authorize the IDB to commence sanctions proceedings based solely on Prohibited Practices committed after execution of the relevant financing agreements.  By nevertheless initiating sanctions proceedings as a result of conduct pre-dating the execution of the Loan Agreements, the IDB has breached the remedies provisions in the Loan Agreements.

## THE IDB'S WAIVER OF IMMUNITY

51.    The IDB is a designated "international organization[]" under the IOIA and, accordingly, is afforded the "same" limited immunity from suit "as is enjoyed by foreign governments."  22 U.S.C. § 288a(b).

52.    As is relevant here, an international organization "shall not be immune . . . in any case . . . in which [it] has waived its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1).

53.    The IDB has waived any immunity from the claims asserted in this Complaint through provisions in the financing agreements and through its Charter.

## I.    The Financing Agreements

54.    Two provisions in the financing agreements establish the IDB's waiver of immunity from the claims asserted in this Complaint.

55.    First, the Loan Agreements each state that "[t]his Agreement and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby, including the validity, interpretation, construction, breach, enforcement or termination hereof, shall be governed by, and construed in accordance with, the law of the State of New York of the U.S.A."  Combined Ex. A, CTA § 7.10.1; Combined Ex. B, Senior Loan Agreement § 4.2.1.  A similar provision is contained in the Equity Contribution and Subordination Agreement.  *See* ¶ 22 n.2 *supra* and Combined Ex. C, ECSA §§ 6.10(a).  The IDB's acquiescence to the application of U.S. law to these agreements—including "any claims, controvers[ies], dispute[s] or cause[s] of action" arising out of those agreements—waives immunity from the claims asserted in this Complaint, which arise out of the agreements.

56.    Second, the Loan Agreements each state that the "Senior Lenders shall be entitled under Applicable Law, including the [IOIA], to immunity from *trial by jury* in any proceeding arising out of or relating to this Agreement."  Combined Ex. A, CTA § 7.10.11 (emphasis added); Combined Ex. B, Senior Loan Agreement § 4.2.2 (incorporating Common Terms Agreement § 7.10.11).   A similar provision is contained in the Equity Contribution and Subordination Agreement.  Combined Ex. C, ECSA § 6.10(j).  By specifying that it is immune ***only*** from jury trials, the IDB has waived immunity as to claims "arising out of or relating to" the agreements for which Doe Corporations seek any other form of judicial relief.  That waiver encompasses this action, in which Doe Corporations do not seek a trial by jury.

## II.    The Charter

57.    The IDB also has waived any immunity from the claims asserted in this Complaint through its Charter.

58.    The Charter includes a waiver of the IDB's immunity.  Ex. I, Charter, Art. XI, § 3 ("Actions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purposes of accepting service or notice of process, or has issued or guaranteed securities.").

59.    The Charter waives the IDB's immunity as to the claims in this Complaint because adjudication of these claims will provide corresponding benefits to the IDB sufficient to justify a waiver of its immunity.  Through this action, Doe Corporations seek to clarify whether the IDB's enforcement authority extends to conduct that pre-dates and bears no relation to the execution of the financing agreements that form the basis of the parties' relationship or the disbursement of any funds pursuant to those agreements.

60.    Waiver of immunity from the claims in this Complaint will further the IDB's long-term objectives and organizational purposes of, among other things, "contribut[ing] to the acceleration of the process of economic and social development of the regional development member countries" by "promot[ing] the investment of public and private capital for development purposes" and encouraging and supplementing "private investment" in such projects and activities. *Id.*, Art. I, §§ 1, 2(a).  Without delineation of the IDB's enforcement authority, commercial entities (such as Doe Corporations) could hesitate to pursue, sponsor, or guarantee funding from the IDB Group, or to pursue IDB Group–affiliated or sponsored development projects, for fear of exposing themselves to intrusive enforcement activity and highly punitive sanctions for conduct that pre-dates any contractual relationship with the IDB and does not relate to any funds received from the IDB.  This risk is magnified by the IDB's ability to broadly assert the authority to sanction entities up and down the corporate chain, as it seeks to do in this case.  *See* Ex. J, 2015 Sanctions Procedures § 8.3.  The resulting chill in development and investment would seriously undermine the IDB's core mission.  Resolving the claims in this action thus would enhance the marketability of the IDB's financial products and the credibility of its activities in the lending markets.

61.    The significant benefits that the IDB will gain from a waiver of immunity here are not substantially outweighed by any burdens that the IDB would face in litigating this type of action.  Indeed, Doe Corporations' claims raise a categorical legal question: whether the IDB has the authority to initiate sanctions proceedings (and subsequently impose sanctions) based exclusively on conduct pre-dating the execution of the relevant financing agreements in the absence of contractual language expressly granting the IDB such authority.  Adjudication of Doe Corporations' claims thus would settle a generally applicable legal issue.  It would not open the

courthouse doors to a steady flow of lawsuits against the IDB or otherwise impermissibly intrude on the IDB's internal affairs.

## IRREPARABLE HARM

62.    Doe Corporations face irreparable harm if the IDB's unauthorized sanctions proceedings continue.

63.    Doe Corporations are now, and will continue to be, forced to participate in the IDB's sanctions proceedings even though the IDB lacks any authority to conduct those proceedings or to impose sanctions on Doe Corporations.  Without intervention by this Court, Doe Corporations will have no ability to obtain neutral review of the IDB's illegitimate assumption of power—which, given the IDB's overwhelming structural advantages in the enforcement proceedings, is almost certain to lead to adverse findings and draconian penalties against Doe Corporations.  These sanctions include the significant penalty of debarment, a determination that respondents are "ineligible, either permanently or for a stated period of time, to be awarded and/or participate in additional contracts for [IDB] projects."  Ex. J, 2015 Sanctions Procedures § 8.2.2.  Following such a determination by the IDB, other multilateral development banks likely would recognize and reciprocate the IDB's sanctions, leading to cross-debarment across approximately two dozen international financial institutions.

64.    Doe Corporations also will incur irreparable reputational harm when the IDB discloses the existence of those proceedings, the allegations of misconduct, and the ultimate disposition.  Doe Corporations' core commercial constituents—including government officials, financial institutions, and current and potential customers—will question Doe Corporations' ethics and fitness for business as a result of the IDB's disclosures.

65.    These harms already have begun to materialize.  Earlier this year, for example, a government agency in a country in which Doe Corporations conduct significant business invited a subsidiary of Doe Corporation 1 to participate in a prominent regional event that the agency hosts in partnership with the IDB.  This was a significant opportunity for the subsidiary (and its affiliates, including Doe Corporations) to garner attention and attract new business.  However, the government agency subsequently barred the subsidiary from participating in the event after the IDB told the agency that it had "integrity concerns" with Doe Corporations, in breach of the IDB's own requirements to keep its investigations confidential.

66.    The IDB's actions thus have already jeopardized Doe Corporations' business standing in a key market at a critical time in Doe Corporations' ongoing negotiations for further investment in that market.  Absent the requested remedy, the IDB's dissemination of information concerning the allegations against Doe Corporations will thwart Doe Corporations' ability to maintain existing business relationships and create new ones in a way that cannot be remediated through monetary damages after the fact.

67.    Continuation of the pending sanctions proceedings also will imperil the Commercial Project itself, with the potential for depriving Doe Corporations of the rewards of their significant investment, upending years of construction, and jeopardizing the future of a vital public development project.

68.    Disclosure of the IDB's investigation and sanctions proceedings also will threaten Doe Corporations' ability to secure funding and regulatory approvals needed for their core business activities.  Without this Court's intervention, Doe Corporations' ability to complete complex development projects—which are essential to their business and survival—will be severely compromised.

App. 23

69.     Monetary damages cannot fully compensate Doe Corporations for these and other harms that would occur if the IDB's enforcement proceedings are permitted to continue.

70.     The equitable relief requested by Doe Corporations is warranted when balancing the hardships faced by Doe Corporations and the IDB.  The public interest would not be disserved by entry of the preliminary and permanent injunctions requested by Doe Corporations.

## CAUSES OF ACTION

### I.     Count One:  Breach of Contract

71.     All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth in this paragraph.

72.     In 2018, Doe Corporation 3 and the IDB (expressly through its agent, IDB Invest) entered into the Loan Agreements.  The Loan Agreements are valid written contracts.

73.     Doe Corporation 1 and Doe Corporation 2 assumed obligations through the execution of the Equity Contribution and Subordination Agreement with the IDB, which effectively incorporated the Loan Agreements.   The Equity Contribution and Subordination Agreement is a valid written contract.

74.     Doe Corporations have adequately performed under these Agreements.

75.     Nothing in these Agreements grants the IDB the authority to initiate enforcement proceedings against, or impose sanctions on, Doe Corporations for alleged conduct that occurred before the parties' contractual relationship.

76.     The Common Terms Agreement enumerates fifteen Events of Default and additional Policy Events of Default.  Combined Ex. A, CTA § 6.1, Annex 1-28.  The Senior Loan Agreement incorporates those lists and definitions, adding one Policy Event of Default.  Combined Ex. B, Senior Loan Agreement § 3.4.1.  These provisions of the Loan Agreements are exhaustive

App. 24

and identify all of the acts by Doe Corporations for which the IDB may seek redress. The commission of Prohibited Practices before the execution of the Loan Agreements is not among those acts.

77.     By instituting sanctions proceedings against Doe Corporations for allegedly engaging in Prohibited Practices before the execution of the Loan Agreements, the IDB has breached the Events of Default and Policy Events of Default provisions of the Loan Agreements.

78.     Additionally, the Loan Agreements include an exhaustive list of five potential remedies for committing Events of Default or Policy Events of Default. Combined Ex. A, CTA § 6.2.3; *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a) (incorporating CTA § 6.2.3). The remedies do not expressly mention sanctions proceedings. At most, the Loan Agreements incorporate the Sanctions Procedures, if at all, only insofar as they permit the IDB to "exercise any other remedies that may be available to it under . . . Applicable Law." Combined Ex. A, CTA § 6.2.3; *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a) (incorporating CTA § 6.2.3). The Sanctions Procedures, in turn, authorize the IDB to initiate sanctions proceedings based solely on Prohibited Practices committed after execution of the relevant financing agreements.

79.     By initiating sanctions proceedings against Doe Corporations based on alleged actions that exclusively pre-date the execution of the Loan Agreements, the IDB has breached the remedies provisions in the Loan Agreements.

80.     The IDB's breach of the Loan Agreements is material.

81.     The IDB's breach has caused Doe Corporations immediate financial harm. Doe Corporations have expended and will be forced to continue to expend resources to defend themselves in the sanctions proceedings. Those expenses exceed $75,000.

App. 25

82.    The IDB's breach also has caused Doe Corporations harm that cannot be remedied solely through monetary damages.  In particular, Doe Corporations have been forced to defend themselves in illegitimate sanctions proceedings and will incur irreparable reputational and other harm upon disclosure of those, the underlying allegations, and the ultimate disposition.

83.    The equitable relief requested by Doe Corporations is warranted when balancing the hardships faced by Doe Corporations and the IDB.  The public interest would not be disserved by entry of the preliminary and permanent injunctions requested by Doe Corporations.

## II.    Count Two:  Breach of the Implied Covenant of Good Faith and Fair Dealing

84.    All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth in this paragraph.

85.    In 2018, Doe Corporation 3 and the IDB (expressly through its agent, IDB Invest) entered into the Loan Agreements.  The Loan Agreements are valid written contracts.

86.    Doe Corporation 1 and Doe Corporation 2 assumed obligations through the execution of the Equity Contribution and Subordination Agreement with the IDB, which effectively incorporated the Loan Agreements.  The Equity Contribution and Subordination Agreement is a valid written contract.

87.    Under New York law, which governs the Loan Agreements and the Equity Contribution and Subordination Agreement, the IDB owes Doe Corporations an implied duty of good faith and fair dealing.  This duty includes the obligation not to destroy or injure Doe Corporations' rights to receive the fruits of those Agreements.

88.    Nothing in these agreements grants the IDB the authority to initiate enforcement proceedings against, or impose sanctions on, Doe Corporations for actions that occurred before the commencement of the parties' contractual relationship.

89.    The Common Terms Agreement enumerates fifteen Events of Default and additional Policy Events of Default.  Combined Ex. A, CTA § 6.1, Annex 1-28.  The Senior Loan Agreement incorporates those lists and definitions, adding one Policy Event of Default.  Combined Ex. B, Senior Loan Agreement § 3.4.1.  These provisions of the Loan Agreements are exhaustive and identify all the acts by Doe Corporations for which the IDB may seek redress.  The commission of Prohibited Practices before the execution of the Loan Agreements is not among those acts.

90.    Additionally, the Loan Agreements include an exhaustive list of five potential remedies for committing Events of Default or Policy Events of Default.  Combined Ex. A, CTA § 6.2.3; *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a) (incorporating CTA § 6.2.3).  The remedies do not expressly mention enforcement proceedings.  At most, the Loan Agreements incorporate the Sanctions Procedures, if at all, only insofar as they permit the IDB to "exercise any other remedies that may be available to it under . . . Applicable Law."  Combined Ex. A, CTA § 6.2.3; *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a) (incorporating CTA § 6.2.3).  The Sanctions Procedures, in turn, authorize the IDB to initiate sanctions proceedings based solely on Prohibited Practices committed after execution of the relevant financing agreements.

91.    The Equity Contribution and Subordination Agreement does not contain any provision that authorizes the initiation of sanctions proceedings in connection with a party's alleged commission of Prohibited Practices before the execution of that agreement (or the Loan Agreements).

92.    The Loan Agreements and the Equity Contribution and Subordination Agreement thus gave rise to a reasonable and implied promise that the IDB would not initiate sanctions proceedings against Doe Corporations based on alleged conduct pre-dating the agreements' execution—particularly given that the agreements were executed against the backdrop of the

App. 27

Charter's and the Sanctions Procedures' limitation of the IDB's sanctions authority to conduct post-dating the execution of financing agreements. Such a fundamental promise, which determines the scope of far-reaching sanctions authority to which Doe Corporations subjected themselves by executing the agreements, is necessary to effectuate the purposes of these agreements.

93.     By initiating sanctions proceedings against Doe Corporations based on actions that exclusively pre-date the start of the parties' contractual relationship, with no basis for doing so, the IDB has breached this implied promise, deprived Doe Corporations of the fruits of these agreements, and thus breached the implied covenant of good faith and fair dealing.

94.     The IDB's breach of the implied covenant of good faith and fair dealing has caused Doe Corporations immediate financial harm. Doe Corporations have expended and will be forced to continue to expend resources to defend themselves in the sanctions proceedings. Those expenses exceed $75,000.

95.     The IDB's breach of the implied covenant of good faith and fair dealing also has caused Doe Corporations harm that cannot be remedied solely through monetary damages. In particular, Doe Corporations have been forced to defend themselves in illegitimate enforcement proceedings and will incur irreparable reputational harm upon disclosure of those sanctions proceedings, the underlying allegations, and the ultimate disposition.

96.     The equitable relief requested by Doe Corporations is warranted when balancing the hardships faced by Doe Corporations and the IDB. The public interest would not be disserved by entry of the preliminary and permanent injunctions requested by Doe Corporations.

**III.     Count Three:  Declaratory Judgment Under 28 U.S.C. § 2201**

97.     All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth in this paragraph.

98.     Doe Corporations seek a declaratory judgment pursuant to 28 U.S.C. § 2201 that the IDB lacks the authority to initiate sanctions proceedings against Doe Corporations or otherwise impose sanctions on Doe Corporations based on alleged actions that occurred exclusively before the start of the parties' contractual relationship.

99.     An actual case or controversy exists within the jurisdiction of this Court regarding the scope and meaning of Doe Corporations' rights pursuant to the Loan Agreements and the authority of the IDB to subject Doe Corporations to sanctions proceedings and impose sanctions based on actions that occurred exclusively before the start of the parties' contractual relationship.

100.    Doe Corporations accordingly seek a judgment pursuant to 28 U.S.C. § 2201 declaring that the IDB may not pursue sanctions proceedings or impose sanctions against Doe Corporations based on conduct that occurred exclusively before the start of the parties' contractual relationship.

101.    Without the issuance of declaratory relief from this Court, Doe Corporations will remain subject to the IDB's sanctions proceedings and the imposition of potentially draconian sanctions.

102.    Issuing the requested declaratory relief will clarify the parties' existing rights and afford relief to Doe Corporations from the uncertainty and controversy that give rise to this proceeding.

### RELIEF REQUESTED

WHEREFORE, Doe Corporations respectfully pray that this Court enter judgment against the IDB for the following:

1. A preliminary injunction barring the IDB from continuing the IDB's pending sanctions proceedings, pursuing charges, or imposing sanctions against Doe Corporations based on alleged conduct that pre-dates the execution of the Loan Agreements pending the final resolution of the claims asserted in this action;

2. A preliminary injunction barring the IDB from disclosing the existence of the investigation against Doe Corporations that gave rise to the pending sanctions proceedings, the allegations against Doe Corporations in the Statement of Charges or Notices, and any other allegations of Prohibited Practices against any party arising out of the same events;

3. An injunction barring the IDB from continuing the IDB's pending sanctions proceedings, pursuing charges, or imposing sanctions against Doe Corporations based on alleged conduct that pre-dates the execution of the Loan Agreements;

4. An injunction barring the IDB from disclosing the existence of the investigation against Doe Corporations that gave rise to the pending sanctions proceedings, the allegations against Doe Corporations in the Statement of Charges or Notices, and any other allegations of Prohibited Practices against any party arising out of the same events;

5. A declaration that the IDB may not pursue or continue the pending sanctions proceedings against Doe Corporations;

6. A declaration that the IDB may not commence or continue sanctions proceedings against, pursue charges against, or otherwise sanction, Doe Corporations based on conduct that pre-dates the execution of the Loan Agreements;

7.      Damages in excess of $75,000 in an amount to be calculated;

8.      Costs and fees incurred in this action to the extent permitted by law;

9.      Pre- and post-judgment interest to the extent permitted by law; and

10.     Such other relief as the Court may deem just and proper.


Dated: May 8, 2025                 Respectfully submitted,


/s/ *Margaret E. Krawiec*
Margaret E. Krawiec (D.C. Bar No. 490066)
Michael A. McIntosh (D.C. Bar No. 1012439)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Ave. NW
Washington, DC 20005
Phone:  (202) 371-7000
Fax:  (202) 393-5760
margaret.krawiec@skadden.com
michael.mcintosh@skadden.com

Ryan D. Junck (*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM (UK) LLP
22 Bishopsgate
London EC2N 4BQ, United Kingdom
Phone: +44 20 7519 7000
ryan.junck@skadden.com

*Counsel for Plaintiffs Doe Corporation 1, Doe Corporation 2, Doe Corporation 3, and Doe Corporation 4*

App. 31

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| DOE CORPORATION 1, *et al.*, |
| |
| Plaintiffs, |
| |
| v. |
| |
| INTER-AMERICAN DEVELOPMENT |
| BANK, |
| |
| Defendant. |

Civil Action No. 25-1404

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs are corporate entities who have filed this lawsuit against the Inter-American

Development Bank, claiming that the IDB has improperly initiated sanctions proceedings against

them.  <u>See</u> ECF No. 1 (Compl.), ¶¶ 1–4.  Doe Corporations allege that those proceedings violate

both Defendant's governing charter and its contracts with Plaintiffs.  <u>Id.</u>, ¶ 2.  Concerned that

revealing that they are the subjects of the IDB's sanctions proceedings would result in

"reputational harm," "crater new business," and "jeopardize existing projects," Doe Corporations

now move to proceed under pseudonyms.  <u>See</u> ECF No. 2-1 (Mot.) at 2.  As Plaintiffs have not

made the detailed showing required to overcome the presumption in favor of disclosure, the

Court will deny the Motion.  <u>See</u> LCvR 40.7(f) (providing that Chief Judge shall "hear and

determine . . . motion[s] to file a pseudonymous complaint").

I.      **Legal Standard**

Generally, a complaint must identify the plaintiff.  <u>See</u> Fed. R. Civ. P. 10(a); LCvR

5.1(c)(1).  This identification requirement reflects the "presumption in favor of disclosure [of

litigants' identities], which stems from the 'general public interest in the openness of

governmental processes,' and, more specifically, from the tradition of open judicial proceedings." In re Sealed Case, 931 F.3d 92, 96 (D.C. Cir. 2019) (quoting Wash. Legal Found. v. U.S. Sent'g Comm'n, 89 F.3d 897, 899 (D.C. Cir. 1996)).  A party moving to proceed pseudonymously thus "bears the weighty burden of both demonstrating a concrete need for such secrecy[] and identifying the consequences that would likely befall it if forced to proceed in its own name."  In re Sealed Case, 971 F.3d 324, 326 (D.C. Cir. 2020).  As a result, the court must "'balance the litigant's legitimate interest in anonymity against countervailing interests in full disclosure'" by applying a "flexible and fact driven" balancing test.  Id. (quoting In re Sealed Case, 931 F.3d at 96).  That test assesses "five non-exhaustive factors":

> [1] whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of [a] sensitive and highly personal nature;

> [2] whether identification poses a risk of retaliatory physical or mental harm to the requesting party or[,] even more critically, to innocent non-parties;

> [3] the ages of the persons whose privacy interests are sought to be protected;

> [4] whether the action is against a governmental or private party; and, relatedly,

> [5] the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

Id. at 326–27 (quoting In re Sealed Case, 931 F.3d at 97) (first alteration in original).

## II.    Analysis

Although their Motion raises close questions, Plaintiffs have, for now, not met their burden to show that their privacy interests outweigh the public's presumptive and substantial interest in learning their identities.  The Court will address each of the five factors in turn.

App. 33

First, disclosure of Plaintiffs' identities will not reveal any information of a "sensitive [or] highly personal nature." Id. at 326 (quoting In re Sealed Case, 931 F.3d at 97). The Complaint reveals no "intimate or sensitive personal information" of the kind "traditionally recognized under this factor, such as sexual activities, reproductive rights, [and] bodily autonomy." Doe v. Rogers, 2023 WL 1470007, at *2 (D.D.C. Feb. 2, 2023) (quoting Doe v. Bogan, 542 F. Supp. 3d 19, 23 (D.D.C. 2021)). Although the harms Plaintiffs allege do not fall into that category, they nonetheless maintain that disclosure would "cause severe reputational and financial harm." Mot. at 9. These concerns are certainly relevant to the first factor. See Doe v. Lieberman, 2020 WL 13260569, at *3 (D.D.C. Aug. 5, 2020) (weighing whether disclosure of allegations of professional misconduct against plaintiff would limit her ability to practice medicine). They cannot, however, be mere "speculative and unsubstantiated claims of harm." John Doe Co. No. 1 v. CFPB, 195 F. Supp. 3d 9, 22 (D.D.C. 2016) (citation omitted).

Here, Plaintiffs have provided adequate evidence to support "their contention that public disclosure that they are subject to an ongoing [IDB] investigation would likely cause them debilitating reputational and financial hardship." Id. at 21. They submit a declaration from John Doe, the "Group Chief Legal Officer and General Counsel of Doe Corporation 1, the parent company of Doe Corporation 2, Doe Corporation 3, and Doe Corporation 4." ECF No. 2-2 (John Doe Decl.), ¶ 2. Doe explains that "Doe Corporations will suffer severe and permanent harm if their identities are disclosed." Id., ¶ 4. Like the declarant in John Doe Co. No. 1, Doe has "substantial experience" in the relevant industry. Id., ¶ 3. And like the John Doe Co. No. 1 declarant, Doe notes the "highly competitive nature of Doe Corporations' industry" and the likelihood that Plaintiffs will lose business from current and potential customers. Id., ¶ 10; see John Doe Co. No. 1, 195 F. Supp. 3d at 21. He explains that "Doe Corporations rely to a

significant degree on their hard-earned reputation for ethical dealings and regulatory compliance when soliciting new customers, maintaining current customers, and obtaining approvals from governments and regulatory authorities typically needed to conduct their business activities"; indeed, "[e]ntities accused of or adjudicated to have engaged in corrupt conduct are often barred from or otherwise disadvantaged in participating in commercial tenders." Doe Decl., ¶ 7. Doe buttresses those assertions with specific examples of harm Doe Corporations have already suffered. He recounts an instance in which a government agency "reversed course and barred [a subsidiary of Doe Corporation 1] from participating in [an] event on account of supposed 'integrity concerns' that the IDB had raised about Doe Corporations." Id., ¶ 9. He also avers that the government of the country in which the relevant commercial project is sited is likely to terminate its agreement with Doe Corporations based on Defendant's allegations. Id., ¶ 11. This, then, is not a case in which Plaintiffs have "merely asserted that disclosure of the ongoing investigation could fracture the plaintiffs' business relationships" or only "loosely identified the mechanism for potential damage but did not more specifically explain why harm was likely to result." John Doe Corp. v. PCAOB, 2025 WL 304795, at *3 (D.D.C. Jan. 27, 2025). Doe Corporations have instead provided sufficient explanations and support to succeed under the first factor.

The second and third factors, however, support disclosure. Plaintiffs do not express any fear that the IDB will retaliate against them, nor do they contend that any minors are involved. Whether these factors are thereby framed as "inapplicable," Doe v. Merrill Lynch, 2016 WL 10844617, at *1 (D.D.C. Apr. 28, 2016), or weighing "in favor of disclosure," id., their disposition makes Plaintiffs' Motion less compelling insofar as they fail to support the use of a pseudonym.

App. 35

The fourth factor also supports disclosure. The IDB is "an international organization that was created by a multinational agreement." Compl., ¶ 35. While it is not a governmental actor, it nevertheless has a quasi-governmental structure and purpose and therefore may "not share the concerns about reputation that private individuals have when they are publicly charged with wrongdoing." J.W. v. District of Columbia, 318 F.R.D. 196, 201 (D.D.C. 2016) (quoting Doe v. Cabrera, 307 F.R.D. 1, 8 (D.D.C. 2014)). Regardless of the governmental status of Defendant, moreover, this Court favors pseudonymity in lawsuits against a government defendant only when plaintiffs request individualized relief. Plaintiffs' challenge is not grounded in their specific circumstances or limited to individualized relief; as they explain, they seek "to resolve questions of law — including those concerning the IDB's immunity and compliance with contractual duties — on an undisputed factual record." Mot. at 15. Because their "arguments would clearly apply beyond [their] case," this factor weighs against pseudonymity. John Doe Corp. v. PCAOB, 2025 WL 304795, at *3.

The fifth factor, on the other hand, supports pseudonymity. Defendant would suffer no "risk of unfairness" if the Motion were granted, as it is already aware of Plaintiffs' identities. See Mot. at 15; In re Sealed Case, 971 F.3d at 326 n.1 (explaining that this factor is "not implicated" where defendant knows plaintiff's identity).

In sum, the first and fifth factors weigh in favor of granting pseudonymity. Because the second, third, and fourth factors support disclosure, however, the Court concludes that Doe Corporations have not met "the weighty burden" of "demonstrating a concrete need" for pseudonymity in this lawsuit. In re Sealed Case, 971 F.3d at 326.

App. 36

**III.    Conclusion**

The Court accordingly ORDERS that:

1.  Plaintiffs' [2] Motion for Leave to File Under Pseudonym is DENIED;

2.  Within fourteen days of the Court's Order, Plaintiffs shall file a Notice advising the Clerk of the Court whether they wish to proceed with filing the Complaint on the public docket using their real names, and, if so, shall also file their [2] Motion on the public docket as an appendix to the Notice; and

3.  If Plaintiffs do not file such Notice within fourteen days, the Clerk is directed to terminate the case.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  May 15, 2025

App. 37

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

DOE CORPORATION 1, *et al.*,

     Plaintiffs,

         v.

INTER-AMERICAN
DEVELOPMENT BANK,

     Defendant.

Civil Action No. 25-1404

---

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs are corporate entities who have filed this lawsuit against the Inter-American

Development Bank claiming that the IDB has improperly initiated sanctions proceedings against

them.  <u>See</u> ECF No. 1 (Compl.), ¶¶ 1–4.  These proceedings, Doe Corporations contend, exceed

the authority granted to Defendant in its governing charter and violate its contracts with

Plaintiffs.  <u>Id.</u>, ¶ 2.  In a prior Memorandum Opinion, this Court denied Doe Corporations'

motion to proceed in this litigation pseudonymously.  <u>See</u> ECF No. 6 (Mem. Op.) at 5–6.

Plaintiffs now move for the Court to reconsider that denial.  <u>See</u> ECF No. 8 (Recon. Mot.) at 1.

The Court declines.

**I.    Legal Standard**

Doe Corporations seek relief pursuant to Federal Rule of Civil Procedure 54(b), which

applies to orders that "may be revised at any time."  Relief may be granted pursuant to Rule

54(b) "as justice requires," a standard that may apply where, among other things, the court "has

patently misunderstood" the parties, strayed far afield of the issues presented, or failed to

consider "a controlling or significant change in the law or facts . . . since the submission of the

App. 38

issue." <u>Cobell v. Norton</u>, 224 F.R.D. 266, 272 (D.D.C. 2004) (quotation marks omitted). A court's discretion under Rule 54(b), however, is "limited by the law of the case doctrine and subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." <u>Singh v. George Wash. Univ.</u>, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (quotation marks omitted).

## II.    Analysis

In their initial motion, Plaintiffs prevailed on the first and fifth factors of the five-factor inquiry from <u>In re Sealed Case</u>, 971 F.3d 324, 326–27 (D.C. Cir. 2020), which determines whether a plaintiff can proceed pseudonymously. <u>See</u> Mem. Op. at 3–5. The Court, however, denied that motion because they fell short on the second, third, and fourth factors. <u>See id.</u> at 5. Doe Corporations now challenge the Court's determination. Specifically, they contend that the Court was overly "mechanical" in its application of the five-factor test, <u>see</u> ECF No. 8-1 (Recon. Memo) at 2–3, and misapplied the fourth factor. <u>Id.</u> at 5–7. The Court will address each argument in turn.

Plaintiffs' first argument largely boils down to the contention that the Court was not flexible enough in applying the five-factor test in this case. Such an argument, however, "identifies neither a mistake of law nor a justification for relief that the Court has not already considered and rejected." <u>Doe v. Federal Republic of Germany</u>, 2023 WL 4744175, at *2 (D.D.C. July 21, 2023). Indeed, Doe Corporations' accusation that the Court "engage[d] in a wooden exercise of ticking the five boxes" is altogether incorrect. <u>See</u> Recon. Memo. at 3 (quoting <u>In re Sealed Case</u>, 931 F.3d 92, 97 (D.C. Cir. 2019)). First, the Court went well outside the traditional boundaries of the first factor to find that Plaintiffs had provided sufficient information to support pseudonymity. <u>Compare</u> Mem. Op. at 3–4 (finding first factor favors

pseudonymity based on reputational and economic harm), with In re Sealed Case, 971 F.3d at 327 (noting first factor traditionally protects against disclosure of "sensitive or highly personal matter[s]" such as "sexual activities, reproductive rights, bodily autonomy, medical concerns, or the identity of abused minors").  Second, and contrary to Doe Corporations' assertion that the logic of the Court's prior Opinion would prevent non-individual plaintiffs from ever meeting the second factor, see Recon. Memo. at 4, the Court was willing to consider any allegations that Plaintiffs are at risk of retaliation from IDB if their identities are disclosed, even if such risks are not related to physical or mental harm.  See Mem. Op. at 4 (noting that "Plaintiffs do not express any fear that the IDB will retaliate against them" without limiting retaliation to physical or mental harm).  The Court was indeed flexible in considering Doe Corporations' claim; it simply determined that a compelling need for secrecy had not been established.

Plaintiffs' argument, moreover, misconstrues the nature of the pseudonymity inquiry.  As Plaintiffs see it, the Court simply noted that three factors weighed against pseudonymity while two weighed in favor, cursorily noted that three is more than two, and so denied the motion.  See Recon. Memo. at 3.  Not so.  Because "[t]he presumption of openness in judicial proceedings is a bedrock principle of our judicial system, . . . [t]he moving party bears the weighty burden of . . . demonstrating a concrete need for such secrecy" that overcomes the presumption against pseudonymity.  In re Sealed Case, 971 F.3d at 325–26.  Of course, the test is flexible.  But when three factors cut decisively against pseudonymity and Plaintiffs do not make an extraordinarily strong showing on the other two, then a holistic balancing shows that Plaintiffs have not carried their burden.  The difficulty of meeting such a burden is simply reflective of the weighty interests underlying the presumption of openness.  See United States v. Microsoft Corp., 56 F.3d 1448, 1464 (D.C. Cir. 1995) (noting that pseudonymity is "rare dispensation" in legal system)

App. 40

(quotation marks omitted); <u>Doe v. Hill</u>, 141 F.4th 291, 293 (D.C. Cir. 2025) (same).  That the

inquiry is "flexible and fact driven," <u>In re Sealed Case</u>, 971 F.3d at 326, does not mandate an

alternative burden for Plaintiffs in this case — it merely requires the Court to "inquire into the

circumstances of particular cases to determine whether the dispensation is warranted."

<u>Microsoft</u>, 56 F.3d at 1464 (quotation marks omitted).  As the Court has already found, it is not.

      Plaintiffs further contend that the Court misapplied the fourth factor of the pseudonymity

inquiry.  <u>See</u> Recon. Memo. at 5–7.  That one hinges on "the nature of the relief sought.  When a

plaintiff requests individualized relief against a government defendant," then the factor favors

pseudonymity.  <u>Doe v. Blinken</u>, No. 24-1629, ECF No. 3 (<u>Blinken</u> Mem. Op.) at 5 (D.D.C. June

11, 2024); <u>Hill</u>, 141 F.4th at 298–99.  Plaintiffs maintain that "they seek only to enjoin the IDB's

sanctions proceedings against them," and thus the relief they seek is individualized.  <u>See</u> Recon.

Memo. at 6.  The nature of the relief sought actually encompasses something broader: a

declaration that the "IDB lacks the authority to initiate sanctions proceedings against Doe

Corporations . . . based on alleged actions that occurred exclusively before the start of the

parties' contractual relationship."  Compl., ¶ 98.  For the Court to so declare, it must first

determine that the IDB's charter, which demarcates its "enforcement authority," <u>id.</u>, ¶ 37, does

not grant the IDB authority to begin enforcement proceedings based on pre-contractual behavior

writ large.  <u>Id.</u>, ¶ 2 (arguing that Defendant's sanctions against Doe Corporations violate "both its

governing charter and its contracts with Doe Corporations").

      Such a determination plainly "seeks to alter the operation of public law both as applied to

[Plaintiffs] and, by virtue of the legal arguments presented, to other parties going forward."  <u>In re

Sealed Case</u>, 971 F.3d at 329; <u>cf.</u> <u>Hill</u>, 141 F.4th at 299 ("Given the far-reaching consequences of

the relief [plaintiff] seeks," the fourth factor favors disclosure.).  Even if the nature of the relief

App. 41

in this case is perhaps narrower than the relief sought in John Doe Corporation v. Public
Company Accounting Oversight Board, 2025 WL 304795 (D.D.C. Jan. 27, 2025), that does not
automatically imply that the sought-after relief is individualized. Nor do Defendant's
comparatively lesser reputational concerns, see J.W. v. District of Columbia, 318 F.R.D. 196, 201
(D.D.C. 2016), outweigh the "intensified" interest in proceeding publicly in these circumstances.
In re Sealed Case, 971 F.3d at 329; Hill, 141 F.4th at 299 ("[T]he public interest in understanding
the genesis and generator of the litigation is great."). The fourth factor thus continues to favor
disclosure.

Plaintiffs' additional contention that the Court "discount[ed] Doe Corporations' showings
on the first and fifth factors" does little to justify reconsideration on its own. See Recon. Memo,
at 3. The Court fully acknowledges that Plaintiffs possess a substantial privacy interest in this
case and little risk of prejudice to IDB from pseudonymity. See Mem. Op. at 3–5; see also John
Doe Co. v. CFPB, 321 F.R.D. 31, 35 (D.D.C. 2017) (finding similar privacy interests for
company under government investigation); John Doe Co. No. 1 v. CFPB, 195 F. Supp. 3d 9,
21–22 (D.D.C. 2016) (similar). But "reputational and financial losses" tend not to "pose threats
as grave as the type of threats . . . that most commonly support pseudonymous treatment," John
Doe. Co. No. 1, 195 F. Supp. 3d at 23; see also Hill, 141 F.4th at 296 ("The privacy interests that
traditionally warrant pseudonymity . . . concern very sensitive information that the public has
recognized as insulated from public scrutiny through legal norms and custom."), and there is zero
alleged risk of retaliation by Defendant or potential harm to minor children from disclosure. See
Mem. Op. at 4. The Court thus cannot conclude that Doe Corporations' need for secrecy, in light
of their wide-reaching legal arguments, outweighs the interests in judicial openness.

App. 42

As a final note, the Court considers Plaintiffs' contention that applying the fourth factor in this way "would make it impossible for anyone — individual or non-individual — to satisfy this factor when suing official actors . . . whenever their claims . . . implicate questions that could apply to nonparties." Recon. Memo. at 6–7. As mentioned above, however, the assigned court here must directly resolve wide-reaching questions about IDB's enforcement authority before it can grant relief to Doe Corporations. This is amply distinguishable from cases where the relief is focused on the individual but may incidentally touch on broader issues. Compare T.F. ex rel. Ellern-Feldman v. District of Columbia, No. 23-3612, ECF No. 4 (T.F. Mem. Op.) at 4 (D.D.C. Dec. 7, 2023) (factor supported pseudonymity where "[p]laintiff [sought] to vindicate merely his individual right to a Free and Appropriate Public Education under IDEA") (quotation marks omitted), with Doe A v. Spahn, No. 23-2859, ECF No. 7 (Spahn Mem. Op.) at 4–5 (D.D.C. Oct. 2, 2023) (factor disfavored pseudonymity where plaintiffs alleged that "Peace Corps has a policy or practice of discriminating against individuals like Plaintiffs," which were "far-reaching legal claims") (quotation marks omitted). Doe Corporations' argument is thus overstated; as long as the relief requested by a plaintiff against an official actor is individualized and does not require a court to grant programmatic relief in the process, the fourth factor favors pseudonymity. See Hill, 141 F.4th at 300 ("A byproduct of government transparency is that those who seek to alter public law by using the federal courts must, in all but truly exceptional cases, reveal their identity so that the public can understand the issues before the court, the consequences of the court's ruling, and the manner in which the court reached its decision.").

As Doe Corporations have not met their "weighty burden of . . . demonstrating a concrete need" for pseudonymity, In re Sealed Case, 971 F.3d at 326, the Court will deny the Motion.

App. 43

**III.    Conclusion**

The Court accordingly ORDERS that:

1.  Plaintiffs' [8] Motion for Reconsideration is DENIED;

2.  Within fourteen days of the Court's Order, Plaintiffs shall file a Notice advising the Clerk of the Court whether they wish to proceed with filing the Complaint on the public docket using their real names, and, if so, shall also file their [2] Motion for Leave to File under Pseudonym and [8] Motion for Reconsideration on the public docket as an appendix to the Notice; and

3.  If Plaintiffs do not file such Notice within fourteen days, the Clerk is directed to terminate the case.

s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  July 30, 2025

App. 44

**DECLARATION IN SUPPORT OF MOTION TO PROCEED UNDER PSEUDONYM AND FOR PRELIMINARY INJUNCTION**

**FILED UNDER SEAL IN VOLUME II**

**CORPORATE DISCLOSURE STATEMENT**

**FILED UNDER SEAL IN VOLUME II**